1
2
3
4
5
6
7
8            **UNITED STATES DISTRICT COURT**
9            **EASTERN DISTRICT OF CALIFORNIA**
10

11   HARRISON Y. HARRIS,                    )   Case No.: 1:16-cv-00281 - LJO -JLT
                                            )
12              Plaintiff,                  )   AMENDED FINDINGS AND
                                            )   RECOMMENDATIONS GRANTING
13        v.                                )   DEFENDANTS' MOTION TO COMPEL
                                            )   ARBITRATION
14   HALLIBURTON COMPANY, et al.,           )
                                            )   (Doc. 10)
15              Defendants.                 )
                                            )
16 _____ )

17          Halliburton Company and Halliburton Energy Services, Inc. seek to have the Court compel the

18   parties to participate in arbitration and to stay this action.  (Doc. 10)  The Court reviewed the positions

19   of the parties and found the matter suitable for decision without oral arguments.  Accordingly, the

20   motion was taken under submission pursuant to Local Rule 230(g).  For the following reasons, the

21   Court recommends Defendants' motion to compel arbitration be **GRANTED**.

22   **I.      Background**

23          Plaintiff "is an African-American transgender man who is a U.S. Army Veteran and holds a

24   computer engineering degree."  (Doc. 1 at 4, ¶ 14)   When Plaintiff sought employment with

25   Halliburton in 2014, "Plaintiff was taking male hormones as part of his transition."  (Doc. 1 at 5, ¶ 15)

26   Plaintiff asserts that "[a]lthough he had not yet legally changed his name, Plaintiff identified himself

27   as a transgender man during his interview."  (*Id.*, ¶ 18)  Plaintiff alleges, "Halliburton did not hire

28   Plaintiff as an engineer even though he had an engineering degree and was qualified to work as an

                                           1

engineer for Halliburton. Instead, Halliburton offered Plaintiff work as an operator assistant." (*Id.*) Plaintiff "believes that he was the only operator assistant who had an engineering degree." (*Id.*)

According to Plaintiff, "[f]rom the first day he worked for Halliburton, Plaintiff consistently presented as male and asked to be referred to by the gender-neutral name 'Star.'" (Doc. 1 at 6, ¶ 20) Plaintiff asserts that during the "initial training[,] he learned his fellow trainees, also operator assistants, had received a relocation bonus that he had not received." (*Id.*)  "When Plaintiff asked why he had not received a relocation bonus, he was told that the bonus was not available for new hires." (*Id.*)  Plaintiff contends the "explanation did not make sense because the Halliburton relocation bonus plan stated that the bonus was available to new hires" and "his peers, who were also new hires, had received the relocation bonus." (*Id.*)

Plaintiff asserts that during training, the Halliburton Human Resources Department called him in "because someone had reported that he had gone into the women's bathroom, which purportedly was making women uncomfortable." (Doc. 1 at 6, ¶ 21)  Plaintiff contends the report was untrue because "Plaintiff had been avoiding using any bathroom at Halliburton during his training and had, in fact, not gone into the women's restroom." (*Id.*)  According to Plaintiff, "[t]he Halliburton Human Resources representative told Plaintiff that he should use what she described as the transgender bathroom," which was located "several hundred yards across the motor yard from the training center in a secluded area." (*Id.*)  Plaintiff asserts "[t]he supposed transgender bathroom … had no lock on the door," and "[t]his was upsetting to Plaintiff who had previously been the victim of a violent hate crime because of his gender identity." (*Id.*)

In addition, Plaintiff asserts that despite the "request to be called by the gender neutral name … a Halliburton supervisor told Plaintiff that because he had not yet legally changed his name and because he was identified as 'Michelle' in his company email address, Halliburton was going to call him 'Michelle' and identify him as 'Michelle' in company communications." (Doc. 1 at 6, ¶ 22) According to Plaintiff, "In short, Halliburton told Plaintiff, who was living and presenting as male, that it intended to repeatedly compromise his safety and privacy by outing him as transgender as a matter of company policy." (*Id.* at 6-7, ¶ 22)  Plaintiff then "contacted the Halliburton IT Department to request that that Halliburton use his more gender neutral middle name 'Star' instead of 'Michelle' in

his email address." (*Id.* at 7, ¶ 23)  Plaintiff was told the name could be changed "with his manager's approval." (*Id.*)  Plaintiff asserts he "requested the approval, but the name on his email address was never changed." (*Id.*)  Therefore, Plaintiff contends that "[f]or the rest of his employment, [he] was outed as a transgender person whenever he sent, received or was copied on an email." (*Id.*)

Plaintiff asserts he "began working in the field for Halliburton on or about April 29, 2014," at which time he "was the only non-Latino member of the crew." (Doc. 1 at 7, ¶ 24)  Plaintiff reports that when he asked the crew "[to] speak English, he was told, "We only need to speak English to tell you what the fuck to do." (*Id.*)  Plaintiff contends,

> The crew was supposed to train Plaintiff, but they never showed Plaintiff how to do anything.  He had to try to learn by watching the other team members work.  The crew knowingly put Plaintiff's safety at risk.  For example, the crew members were supposed to carry radiation dosimeters so they could measure the amount of radiation they were exposed to.  No one on the crew told Plaintiff that he needed to carry a dosimeter, making him unable to determine if he had been exposed to a dangerous level of radiation.

(*Id.*)  Plaintiff alleges he also "overheard one of the crew members, Jose Cabrela, call him a racial slur while speaking on the phone." (*Id.*)

In June 2014, Plaintiff was transferred to a new crew.  (Doc. 1 at 8, ¶ 26)  Plaintiff reports that "[t]he engineer in charge of the crew was a Caucasian male, Nick Blaine," who Plaintiff asserts told him "you might as well pack your shit and move out of Bakersfield back to where you came from" and "a 'nigger' would never be believed over Blaine." (*Id.*)  Further, Plaintiff asserts "[a]nother operator, Chaneh Davis told Plaintiff that he, Davis, was a 'known racist' and would probably call Plaintiff a nigger if he did not think he would be disciplined for it." (*Id.*)

According to Plaintiff, "Blaine and his crew made false reports to Plaintiff's second level supervisor, Vern Thiede and Plaintiff's third level supervisor, Rocky Lawrence about Plaintiff's competence and attitude." (Doc. 1 at 8, ¶ 27)  Plaintiff reports he received "a Performance Improvement Plan" from Mr. Lawrence on June 9, 2014, "which accused Plaintiff of being insubordinate, non-cooperative, and failing to arrive to work on time." (*Id.*, ¶ 28)  Plaintiff contends the plan "offered no details to support its claims and identified no specific instance of non-cooperative or insubordinate behavior." (*Id.*)

On June 11, 2014, "Plaintiff took medical leave to care for a carpal tunnel condition with his

1   hands." (Doc. 1 at 8, ¶ 29)  He asserts, "Halliburton knew that Plaintiff had taken medical leave

2   because he informed Halliburton so that he could receive guidance on how to properly code his time off

3   on his timecard." (*Id.*)  However, "Halliburton never engaged in the interactive process with Plaintiff."

4   (*Id.*)  Plaintiff reports he "returned to work at Halliburton on or about June 15" of 2014. (*Id.*)

5          Plaintiff contends that on June 16, 2014, he "complained to Halliburton Human Resources

6   Department representative, Missy Rindge, and his supervisors, Rocky Lawrence, Chris Bagwell and

7   Vernon Thiede"—who are all Caucasion males—regarding "the discrimination he was suffering."

8   (Doc. 1 at 8-9, ¶ 30)  Plaintiff reports "Halliburton's only response to Plaintiff's complaint was that

9   they would 'look into' it." (*Id.* at 9, ¶ 30)

10          According to Plaintiff, "On or about June 17, Halliburton sent Plaintiff out to the field with

11   Blaine." (Doc. 1 at 9, ¶ 31)  Plaintiff alleges that "[s]everal times during the job, Blaine lowered heavy

12   tools onto Plaintiff's hands and wrists without warning." (*Id.*)  In addition, "Plaintiff also found a

13   length of rope fastened as a hangman's noose when Plaintiff went to the top of a drilling rig to perform

14   work." (*Id.*)  Plaintiff reports he "began to fear for his safety when working with Blaine." (*Id.*)

15          Further, Plaintiff asserts he received two warnings in June, which "placed Plaintiff in the

16   position that he was one step away from termination," only 11 days after complaining about

17   discrimination. (Doc. 1 at 9, ¶ 34)  First, Plaintiff alleges Thiede gave Plaintiff a "warning for

18   purportedly failing to attach a tag line to tools when sending them down to the ground" on June 19.

19   (*Id.*, ¶ 32)  He reports a supervisor sent another employee "to observe Plaintiff's performance without

20   Plaintiff's knowledge," and "[t]he employee told Plaintiff that he felt badly about Plaintiff receiving the

21   warning because Plaintiff had done an excellent job." (*Id.*)  Plaintiff reports that on June 27, "Thiede

22   issued Plaintiff a 'written' warning, which was the second step in Halliburton's progressive discipline."

23   (*Id.*, ¶ 33)  Plaintiff asserts another day, Thiede sent Plaintiff home from work after Davis "started an

24   argument while Plaintiff in the motor yard," though Davis was not sent home. (*Id.* at 9-10, ¶ 34)

25          According to Plaintiff, in July 2014, "Blaine asked Plaintiff and a Latino operator if they had

26   ever seen the movie Mississippi Burning." (Doc. 1 at 10, ¶ 35)  Plaintiff alleges that "Blaine expressed

27   how much he liked the movie and how he believed that the United States should reinstitute slavery."

28   (*Id.*)  In addition, Plaintiff reports that about two days later,

1
2
3
4
5

Blaine called Plaintiff go out on a job.  While Plaintiff was in the motor yard preparing to go out, Blaine ordered him to assist the lead operator, a Latino male, Jose.  When Plaintiff asked Jose if he needed help, Jose ignored Plaintiff. Plaintiff then returned to the work he had been previously doing.  When Blaine saw that Plaintiff was not assisting Jose, Blaine flew into a rage and ordered Plaintiff to go home.  Blaine demanded that Plaintiff give him the keys to the crew's truck, which was against Halliburton policy because Plaintiff had signed out the truck. Plaintiff said that he would return the keys to the dispatch.  Blaine followed Plaintiff to the dispatch calling Plaintiff a "bitch," "nigger," "she I mean he," and stating, "that's why I'm sending your black ass home."

6

7

8

9

(*Id.* at ¶ 36)  Plaintiff asserts he "complained again to Thiede that Blaine had treated him unfairly and that Plaintiff had suffered discrimination."  (*Id.* at 37)  Plaintiff reports that "[i]nstead of investigating Plaintiff's complaint or remedying the discrimination, Thiede sent Plaintiff home."  (*Id.*)

10

11

12

13

14

He alleges Thiede reassigned Plaintiff to a different employee team "because of the difficulties Plaintiff was having with Blaine and others," but the new team "consisted of Halliburton employees who did not want to regularly work overtime." (Doc. 1 at 10, ¶ 38)  Plaintiff contends the crew members on his first team "stayed in the field for days at a time and earned substantial overtime pay," and the change in teams caused a "substantial" amount of wages to be lost.  (*Id.*)

15

16

17

18

19

20

21

22

Plaintiff asserts that on August 17, 2014, he "received a message from Green Team engineer about an assignment." (Doc. 1 at 10, ¶ 39)  Plaintiff reports when he returned the phone call, "the engineer told him that he had just called to let Plaintiff know that he did not have to go on the assignment since the crew was just about to leave the yard." (*Id.* at 10-11, ¶ 39)  According to Plaintiff, he decided to go to work and when the engineer arrived "he did not seem to have a problem with Plaintiff joining the crew," until the engineer had "brief conversation with a female engineer in training."  (*Id.* at 11, ¶ 39)  Plaintiff asserts the engineer then "suddenly became very hostile to Plaintiff and sent Plaintiff home."  (*Id.*)

23

24

25

26

27

28

Plaintiff alleges that on August 21, 2014, "[he] was called into a meeting with several of his supervisors and the district manager, Larry Miller," during which Mr. Miller "delivered a final written warning to Plaintiff concerning the events of July 22 and August 17." (Doc. 1 at 11, ¶ 40)  Plaintiff reports he reviewed the warning and told Mr. Miller "of the discrimination and harassment he had suffered," and that some of the information in the warning "was untrue."  (*Id.*) Plaintiff asserts Mr. Miller "asked why Plaintiff had not complained about the mistreatment," to which Plaintiff responded

1   "he had complained in June but nothing had been done."  (*Id.*)  Plaintiff contends Mr. Miller then

2   "suggested the Plaintiff transfer to another Halliburton location in Texas or Saudi Arabia," and said

3   "Halliburton would investigate."  (*Id.*)  Plaintiff asserts he had a second meeting with Mr. Miller the

4   same date, during which "Plaintiff again explained to Miller everything that had happened on August

5   17."  (*Id.*, ¶ 41) According to Plaintiff, on August 25, 2014, he "was called back for a third meeting."

6   (*Id.* ¶ 42)  Plaintiff alleges, "As soon as [he] sat down, Miller told him that Halliburton was

7   terminating his employment as a result of the investigation."  (*Id.*)

8           Based upon the foregoing facts, Plaintiff filed a complaint, asserting the following causes of

9   action: (1) race and color discrimination in violation, (2) gender identity/ sex discrimination, (3)

10  disability discrimination, (4) hostile work environment harassment, (5) retaliation, (6) adverse actions

11  in violation of public policy, (7) failure to provide meal period breaks and/or compensation, (8) failure

12  to compensate for all hours worked and minimum wage violations, and (9) waiting time penalties.

13  (*See generally* Doc. 1 at 1, 12-23)

14          On May 3, 2016, Halliburton filed the motion to compel arbitration now pending before the

15  Court, asserting Plaintiff previously agreed to arbitrate claims encompassed in this lawsuit.  (Doc. 10)

16  Halliburton observes that when Plaintiff applied for employment with Halliburton on January 11 and

17  January 29, 2014, Plaintiff acknowledged his "receipt, understanding, and agreement" with the

18  following:

19          I agree that, in return for its consideration of my application for employment, any dispute
        between Halliburton Energy Services, Inc. and me related to the application process will
20      be resolved under the Halliburton Dispute Resolution Program ("DRP"), and that I may
        obtain a copy of the DRP from the Human Resources Department. I understand that this
21      means that disputes involving legal issues must be submitted to binding arbitration, and
        that I am waiving any right to maintain a lawsuit or have a jury trial for any such dispute.
22      I also understand that this does not obligate Halliburton Energy Services, Inc. to employ
        me, but that if I am employed, any dispute between Halliburton Energy Services, Inc. and
23      me relating to my employment also will be subject to the DRP.

24  (Doc. 10-2 at 9, 28)  Plaintiff contends he does "not recall ever learning about the DRP before or

25  during [his] employment at Halliburton."  (Doc. 14-1 at 2, ¶ 3)  Halliburton counters this evidence by

26  showing Plaintiff filled out on-line application forms which required him to agree to the terms of

27  Halliburton's arbitration plan.  Wells Supp. Decl. ¶ 3, Doc. 16 at 2.  The agreement to arbitrate

28  appeared via "pop-up" windows which required the applicant to answer whether he agreed to be

1  bound to arbitration and the failure to do answer the pop-up would prevent the applicant from

2  completing the on-line application form. Id.

3  **II.     Halliburton's Dispute Resolution Program**

4         Halliburton implemented a dispute resolution program ("the Program") for disputes "[b]etween

5  the Company and the Company's present and former Employees and Applicants for employment,

6  including those related to or arising out of a current, former or potential employment relationship with

7  the Company." (Doc. 10-2 at 50)  According to Halliburton, the Program "facilitates resolution of

8  disputes without the expense and delay of court litigation, permits representation of the employee by

9  legal counsel, provides for discovery in accordance with the Federal Rules of Civil Procedure and

10  authorizes an award of attorneys' fees to employees who prevail in arbitration even in the absence of a

11  statute authorizing such an award." (Doc. 10-1 at 3, citations omitted.)

12        Disputes covered by the Program include "all legal and equitable claims, demands, and

13  controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or

14  some other law, between persons bound by the Plan . . ." (Doc. 10-1 at 51)  Thus, the Program

15  encompasses disputes related to "allegations of discrimination based on race, sex, religion, national

16  origin, age, veteran status or disability; sexual or other kind of harassment; wrongful

17  discharge;….[and] failure to pay wages." (*Id.*)   The program does not limit expand or contract any

18  rights the plaintiff would have otherwise nor does it limit the type of recovery a plaintiff may obtain.

19  (*Id.*at 26)

20        Under the Program, parties may engage in mediation or arbitration to resolve their disputes.

21  (Doc. 10-2 at 82)  With mediation, "a neutral person assists the parties in reaching their own

22  settlement but does not have the authority to make a binding decision." (*Id.* at 83)  With arbitration, a

23  dispute is submitted "to one or more impartial persons for a final and binding decision." (*Id.* at 82)  A

24  party "may initiate proceedings by serving a written request to initiate proceedings on [the American

25  Arbitration Association] or [Judicial Arbitration and Mediation Services]." (*Id.* at 60)  Employees

26  initiating arbitration are required to pay a $50 fee, while "[i]f the demand for mediation or arbitration

27  is initiated by the Company, such fees will be paid by the Company." (*Id.* at 71)

28  ///

### III.     Legal Standard

The Federal Arbitration Act ("FAA") applies to arbitration agreements in any contract affecting interstate commerce. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001); 9 U.S.C. § 2. The FAA provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  A party seeking to enforce arbitration agreement may petition the Court for "an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4.

The Court's role in applying the FAA is "limited to determining whether a valid agreement to arbitrate exists and, if so, whether the agreement encompasses the dispute as issue." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  To determine whether an arbitration agreement encompasses particular claims, the Court looks to the plain language of the agreement, and "[i]n the absence of any express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584-86 (1960). Because the FAA "is phrased in mandatory terms," "the standard for demonstrating arbitrability is not a high one [and] a district court has little discretion to deny an arbitration motion." *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991).

"[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).  As a result, arbitration should only be denied when "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Tech., Inc. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986).  It is well-established that "arbitration provides a forum for resolving disputes more expeditiously and with greater flexibility than litigation." *Lifescan*, 363 F.3d at 1011.

### IV.     Discussion and Analysis

#### A.     Governing Law

As an initial matter, the parties disagree as to the law that governs this action.  Plaintiff argues that the Defense Appropriations Act of 2010, also known as the Franken Amendment, and Executive

1   Order No. 13673 govern the action.  (Doc. 14 at 16)  On the other hand, Defendants contend the

2   Federal Arbitration Act governs the action.  (Doc. 10 at 4-8)

3      According to Plaintiff, pursuant to the Defense Appropriations Act of 2010, "any government

4   contractor which accepts a contract in excess of $1M from the Department of Defense must agree to not

5   enter into any new or enforce any arbitration agreement that requires arbitration of Title VII and certain

6   employment tort claims."  (Doc. 14 at 16, citing 48 C.F.R. § 222.7402)  Significantly, however, the

7   Defense Appropriations Act applies "to military contractors with contracts of at least $1 million," and

8   "imposes no substantive prohibitions on arbitration."  *Phifer v. Mich. Sporting Goods Distribs., Inc.*,

9   2010 W.L. 3609367 at *7 (W.D. Mich. July 28, 2010).  Because this action does not involve a

10  government contract, the Defense Appropriations Act "simply does not apply."  *See id.*  Similarly,

11  Executive Order No. 13673, which relates to "parties who contract with the Federal Government," is

12  inapplicable.

13     On the other hand, "the FAA applies to employment contracts if the employment affects

14  interstate commerce."  *CarMax Auto Superstores Cal. LLC v. Hernandez*, 94 F. Supp. 3d 1078, 1100

15  (C.D. Cal. 2015).  "[T]here is a strong default presumption that the Federal Arbitration Act, not state

16  law, supplies the rules for arbitration." Fid. Fed. Bank, FSB v. Durga Ma Corp., 386 F.3d 1306, 1311

17  (9th Cir. 2004) (internal quotation marks omitted).  Here, Defendants demonstrated that its business

18  affects interstate commerce because "Halliburton's Bakersfield, California facility provide[s] services

19  to national and international natural resource production companies."  (Wells Decl. ¶ 6, Doc. 10-2 at 2)

20  The presumption of FAA applicability, coupled with evidence that Defendants operate nationwide[1],

21  indicates that the FAA applies to the arbitration policy.

22    **B.**  **Validity of the arbitration agreement**

23     When determining whether a valid and enforceable agreement to arbitrate has been established

24  for the purposes of the FAA, the Court should apply "ordinary state-law principles that govern the

25  formation of contracts to decide whether the parties agreed to arbitrate a certain matter."  *First Options*

26  *of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Circuit City Stores v. Adams*, 279 F.3d 889, 892

27

28     [1] Notably, Plaintiff alleges in the complaint that Halliburton is a Delaware Corporation with an office located in Bakersfield, California, though the "headquarters and principal place of business is Houston, Texas."  (Doc. 1 at 2, ¶¶2-3)

1  (2002).  Here, the parties agree the law of the state of California governs the determination of whether

2  the agreement is valid.  (*See generally* Doc. 10-1 at 6-8; Doc. 14 at 8-15).

3      Pursuant to California contract law, the elements for a viable contract are "(1) parties capable

4  of contracting; (2) their consent; (3) a lawful object; and (4) sufficient cause or consideration."  *United*

5  *States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999) (citing Cal. Civ. Code § 1550;

6  *Marshall & Co. v. Weisel*, 242 Cal. App. 2d 191, 196 (1966)).  The Supreme Court explained, an

7  agreement to arbitrate may be "invalidated by generally applicable contract defenses, such as fraud,

8  duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their

9  meaning from the fact that an agreement to arbitrate is at issue."  *AT&T Mobility LLC v. Concepcion*,

10  131 S. Ct. 1740, 1746 (2011).

11      Under California law, an arbitration agreement may only be invalidated for the same reasons as

12  other contracts.  Cal. Code Civ. Proc. § 1281.  For example, a contract "is unenforceable if it is both

13  procedurally and substantively unconscionable."  *Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1072

14  (9th Cir. 2007)).  Procedural unconscionability focuses on "oppression and surprise," while substantive

15  unconscionability focuses upon "overly harsh or one-sided results."  *Stirlen v. Supercuts, Inc.*, 51

16  Cal.App.4th 1519, 1532 (1997) (citations omitted).  Both forms of unconscionability must be present in

17  order for a court to find a contract unenforceable, but it is not necessary that they be present in the same

18  degree.  *Davis*, 485 F.3d at 1072; *Stirlen*, 51 Cal. App. 4th at 1532.  Consequently, "[c]ourts apply a

19  sliding scale: 'the more substantively oppressive the contract term, the less evidence of procedural

20  unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.'"

21  *Id.* (quoting *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal. 4th 83, 99 (2000)).

22      Defendant contends the arbitration agreement is valid under general principles of contract law.

23  (Doc. 10-1 at 6-8).  According to Defendant, "Plaintiff acknowledged on three occasions in a one

24  month period that any dispute between him and [Halliburton] regarding his employment must be

25  submitted to binding arbitration under the DRP and that he waived his right to maintain a lawsuit or

26  have a jury trial."  (*Id.* at 7)  In addition, Defendant argues the agreement between the parties "is

27  supported by consideration" due to the "mutuality of obligation" binding both Halliburton and Plaintiff

28  to arbitrate employment-related disputes.  (*Id.*, citing *Bleecher v. Conte*, 29 Cal.3d 345, 350 (1981)).

10

1   On the other hand, Plaintiff asserts that the Program "is simply too corrupted by unconscionability and

2   its many other shortcomings to be effective or reformed." (Doc. 14 at 8)

3              1.    Procedural Unconscionability

4              The threshold issue in for procedural unconscionability "is whether the subject arbitration

5   clause is part of a contract of adhesion." *Stirlen*, 51 Cal. App. 4th at 1532; *see also Soltani v. W. & S.*

6   *Life Ins. Co.*, 258 F.3d 1038, 1042 (9th Cir. 2001). A contract of adhesion "is a standardized contract,

7   which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing

8   party only the opportunity to adhere to the contract or reject it." *Graham v. Scissor-Tail, Inc.*, 28 Cal.

9   3d 807, 817 (1981). Accordingly, the Court must examine "the manner in which the contract was

10  negotiated and the circumstances of the parties at that time." *Kinney v. United Healthcare Services*,

11  70 Cal. App. 4th 1322, 1327 (1999). Specifically, the Court determines whether the contract was

12  "imposed on employees as a condition of employment." *Soltani*, 258 F.3d at 1042.

13             In general, under California law, it is "procedurally unconscionable to require employees, as a

14  condition of employment, to waive their right to seek redress of grievance in a judicial forum." *Ingle*

15  *v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003); *see, e.g., Armendariz*, 24 Cal.4th at

16  113 (explaining an arbitration agreement was procedurally unconscionable because it was imposed on

17  employees as a condition of employment, and there was no opportunity for them to negotiate); *Aral v.*

18  *Earthlink, Inc.*, 134 Cal.App.4th 544, 557 (2005) (an arbitration clause on a "take it or leave it" basis

19  demonstrates "quintessential procedural unconscionability"); *Martinez v. Master Protection Corp.*,

20  118 Cal. App. 4th 107 (2004) (finding an arbitration agreement procedurally unconscionable because

21  it was a prerequisite of employment and the employee did not have an "opportunity to negotiate or

22  refuse to sign the arbitration agreement"); *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th

23  846, 853 (Ct. App. 2001) ("A finding of a contract of adhesion is essentially a finding of procedural

24  unconscionability").

25             *a.    Surprise and knowing waiver*

26             Plaintiff argues that he does "not recall ever learning about the DRP before or during [his]

27  employment at Halliburton" (Doc. 14-1 at 2, ¶ 3) and seems to suggest this renders the agreement

28  unenforceable. (Doc. 14 at 7) However, Stanley Wells, II, the Senior Human Resources Manager at

1  Halliburton Energy Services, Inc., reports that the electronic application process—which Plaintiff

2  completed—included "popup windows" with "terms and conditions that the applicant had to agree to,

3  such as agreeing that all disputes related to the application process, and employment if hired, must be

4  submitted to binding arbitration." (Wells Supp. Decl. ¶ 3, Doc. 16 at 2)  Mr. Wells reports that if an

5  applicant did not agree to a required popup window, "the application [was] considered incomplete."

6  (*Id.*)  Halliburton provided copies of Plaintiff's two completed applications that show Plaintiff

7  indicated his consent to arbitration, which was a required field.  (Doc. 10-2 at 9, 28) Consequently,

8  although Plaintiff may "not recall" agreeing to arbitrate disputes, Halliburton has provided undisputed

9  evidence that Plaintiff did, in fact, agree.

10        Accordingly, when Plaintiff applied for employment with Halliburton, he agreed "any dispute

11  between Halliburton Energy Services, Inc. and [Plaintiff] related to the application process will be

12  resolved under the Halliburton Dispute Resolution Program ("DRP")" and that, if hired, "any dispute

13  between Halliburton Energy Services, Inc. and [Plaintiff] relating to [his] employment also will be

14  subject to the DRP."  (Doc. 10-2 at 9, 28) In addition, when Plaintiff received an offer for employment

15  from Halliburton on February 5, 2014, the letter indicated:

16  > Your acceptance of employment means you also agree to and are bound by the terms of
17  > the Halliburton Dispute Resolution Program, effective January 1, 1998.  The Halliburton
     > Dispute Resolution Program binds the employee and the Company to handle workplace
18  > problems through a series of measures designed to bring to timely resolution.  This will
     > be true both during your employment and after your employment should you terminate.

19  (*Id.* at 44)  Plaintiff indicated he accepted the terms of the offer, including the arbitration program, by

20  signing the letter.  (*Id.* at 45)

21        Notably, the Ninth Circuit determined "Congress intended there to be at least a knowing

22  agreement to arbitrate employment disputes before an employee may be deemed to have waived the

23  comprehensive statutory rights, remedies and procedural protections prescribed in Title VII and related

24  state statutes."  *Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299, 1304 (9th Cir. 1994).  As a result, the

25  court later held "[a]ny bargain to waive the right to a judicial forum for civil rights claims… in

26  exchange for employment or continued employment must at the least be express: the choice must be

27  explicitly presented to the employee and the employee must explicitly agree to waive the specific right

28  in question."  *Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756, 762 (9th Cir. 1997).

In *Lai*, the appellants argued they did not making a knowing waiver of their right to arbitrate employment discrimination claims. *Id.*, 42 F.3d at 1302-1303.  The Court noted that each of the appellants executed a form that stated:

> I agree to arbitrate any dispute, claim or controversy that may arise between me or my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or bylaws of the organizations with which I register.

*Id.* at 1302.  As the Court observed, "This provision does not in and of itself bind appellants to arbitrate any particular dispute."  *Id.*  Instead, "[t]see what appellants possibly could have agreed to arbitrate" they had to look at the arbitration requirements the organization with which the appellants registered: the NASD.  *Id.*  The Court reviewed the NASD manual and observed the terms stated it covered "[a]ny dispute, claim or controversy ...  between or among members and/or associated persons . . . arising in connection with the business of such member(s) or in connection with the activities of such associated person(s)."  *Id.*  The court concluded that because the form signed by the appellants "did not purport to describe the types of disputes that were subject to arbitration" and the NASD manual did not put appellants on notice they were bound to arbitrate their employment disputes, they had not made a knowing waiver of their right to statutory remedies.  *Id.* at 1305.

Similarly, in *Nelson*, the plaintiff argued he had not "'knowingly and voluntarily' agreed to waive his right to a judicial forum."  *Id.*, 119 F.3d at 761.  Nelson received a copy of a revised employee Handbook from his employer and signed an acknowledgement form.  *Id.* The Court reviewed the acknowledgment form and the Handbook and found nothing in either document "put Nelson on notice that . . . he was somehow entering into an agreement to waive a specific statutory remedy afforded him by a civil right statute."  *Id.* at 762.  Because the plaintiff choice was not "explicitly" informed that by continuing his employment he was waiving his rights, the Court found he "did knowingly waive his statutory rights to a judicial forum."  *Id.* at 762-63.

In contrast, Halliburton notified Plaintiff through the application process that it had an employment dispute resolution program.  As explained above, a "popup window" notified Plaintiff of the arbitration program, and stated:

> I agree that, in return for its consideration of my application for employment, any dispute between Halliburton Energy Services, Inc. and me related to the application process will be resolved under the Halliburton Dispute Resolution Program ("DRP"), and that I may obtain a copy of the DRP from the Human Resources Department. **I understand that**

**this means that disputes involving legal issues must be submitted to binding arbitration, and that I am waiving any right to maintain a lawsuit or have a jury trial for any such dispute**. I also understand that this does not obligate Halliburton Energy Services, Inc. to employ me, but that if I am employed, **any dispute between Halliburton Energy Services, Inc. and me relating to my employment also will be subject to the DRP**.

(Doc. 10-2 at 9, 28) (emphasis added).  With both applications, Plaintiff checked the box which indicated, "I acknowledge my receipt, understanding and agreement with this disclosure.  (*Id.*)  In addition, Plaintiff's offer letter indicated that his "*acceptance of employment means* [he] also agreed to and [was] bound by the terms of the Halliburton Dispute Resolution Program." (*Id.* at 44)  Thus, Plaintiff was advised that the Program would encompass "any dispute" related to his employment— including racial and sexual discrimination, harassment, wrongful discharge, and infliction of emotional distress —but repeatedly indicated his consent to arbitrate such claims.  (*See* Doc. 10-2 at 9, 28, 44-45)  Further, Plaintiff was "explicitly" notified that Halliburton requires its employees to agree to its arbitration program, and his employment was contingent upon this agreement, in contrast to the plaintiff in *Nelson*.  Consequently, Plaintiff made a knowing waiver of his statutory rights, and there was no surprise to Plaintiff regarding the arbitration provision.

### b.   *Oppression*

As stated by Defendants, "Before Plaintiff was permitted to submit both of his applications, he was *required* to 'acknowledge [his] receipt, understanding, and agreement' that he would be bound to comply with the DRP." (Doc. 10-1 at 3, emphasis added)  Similarly, Plaintiff's offer of employment "informed Plaintiff that *if he accepted the employment offer*, he was agreeing to submit to the DRP." (*Id.*, emphasis added)  Thus, Halliburton offered Plaintiff the choices to either accept the arbitration agreement or seek employment elsewhere, and the company was in a stronger bargaining position than Plaintiff.  *See Armendariz*, 24 Cal. 4th at 115 (explaining "the economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration agreement").  Because the agreement to submit to the dispute resolution program was offered on a "take it or leave it" basis, the agreement was procedurally

1   unconscionable.[2]  *Circuit City Stores, Inc. v. Adams,* 279 F.3d 889, 893 (9th Cir. 2002).

2   　　　　　2.　　Substantive Unconscionability

3   　　　"Substantive unconscionability addresses the fairness of the term in dispute."  *Szetela v.*

4   *Discover Bank*, 97 Cal. App. 4th 1094, 1100 (Ct. App. 2002). While "parties are free to contract for

5   asymmetrical remedies and arbitration clauses of varying scope," substantive unconscionability "limits

6   the extent to which a stronger party may, through a contract of adhesion, impose the arbitration forum

7   on the weaker party without accepting the forum for itself." *Ting v. AT&T*, 319 F.3d 1126, 1149 (9th

8   Cir. 2003) (quoting *Armendariz*, 24 Cal. 4th at 118).  Thus, the focus of the Court's inquiry is whether

9   an agreement is one-sided and will have an overly harsh effect on the party not given an opportunity to

10   negotiate its terms.  *Flores*, 93 Cal. App. 4th at 854.  The Ninth Circuit instructs courts applying

11   California law to arbitration agreements "look beyond facial neutrality and examine the actual effects

12   of the challenged provision." *Ting*, 319 F.3d at 1149; *see, e.g., Ingle*, 328 F.3d at 1180 (finding an

13   arbitration agreement substantively unconscionable upon review of the agreement's provisions,

14   including claims subject to arbitration, its statute of limitations, class actions, fee and cost-splitting

15   arrangements, remedies available, and termination/modification of the agreement).

16   　　　　　　　a.　　*Claims subject to arbitration*

17   　　　An arbitration agreement that "compels arbitration of the claims employees are most likely to

18   bring against [the employer] but exempts from arbitration the claims [the employer] is most likely to

19   bring against its employees" is substantively unconscionable.  *Ferguson v. Countrywide Credit Indus.*,

20   298 F.3d 778, 785 (2002) (quoting *Mercuro v. Superior Court*, 96 Cal. App. 4th 167, 175-76 (Ct. App.

21   2002).  For example, in *Ferguson* and *Mercuro*,[3] the courts found Countrywide's arbitration agreement

22   was substantively unconscionable, because it excluded claims "for intellectual property violations,

23   unfair competition and/or the use and/or unauthorized disclosure of trade secrets or confidential

24   information." *Ferguson*, 298 F.3d at 785 *Mercuro*, 96 Cal. App. 4th at 176.

25

26   　　　[2]The fact that Plaintiff was not provided a copy of the full arbitration terms to which he would be bound when
applying for a position with Halliburton supports the conclusion that the arbitration agreement was procedurally

27   unconscionable.  *See Carmona v. Lincoln Millennium Car Wash, Inc.,* 226 Cal. App. 4th 74, 84 (2014) ("Failure to
provide the applicable arbitration rules is another factor that supports procedural unconscionability.")
　　　[3]  Both cases involved the arbitration agreement of Countrywide Credit Industries.  *See Ferguson*, 298 at 784

28   ("During oral argument, counsel for Countrywide conceded that the provisions of the arbitration agreement in the present
case are the same as the provisions of the arbitration agreement at issue in *Mercuro*").

Halliburton's Program encompasses claims arising out of "current, former, or potential employment" with Halliburton.  (Doc. 10-2 at 50)  Specifically, the "Plan and Rules" explain disputes encompassed with the Program include:

> [A]ll legal or equitable claims, demands, and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law, between persons bound by the Plan . . . including, but not limited to, any matters with respect to:
>
> 1.  [The] Plan;
>
> 2.  The employment or potential re-employment of an Employee, including the terms, conditions, or termination of such employment with the Company;
>
> 3.  Employee benefits or incidents of employment with the Company; or
>
> 4.  Any other matter related to the relationship between the Employee and the Company including, by way of example and without limitation, allegations of discrimination based on race, sex, religion, national origin, age, veteran status or disability; sexual or other kinds of harassment; wrongful discharge; workers' compensation retaliation; defamation; infliction of emotional distress; or status, claim, or membership with regard to any employment benefit plan;
>
> 5.  An Applicant's application for employment and the Company's actions and decisions regarding such application;
>
> 6.  Any prior resolution or settlement of a Dispute between Parties subject to the Plan; and
>
> 7.  Any personal injury or death allegedly incurred in or about a Company workplace or on Company time.

(Doc. 10-2 at 51-52)  However, the dispute resolution program "does not apply to claims for worker's compensation benefits or unemployment compensation benefits."  (*Id.* at 53-54)

Significantly, unlike in *Armendariz*, the Plan does not exempt Halliburton from arbitrating disputes it has with the employee.  Rather, the Plan notes that "all" disputes "between the persons bound by the Plan" are subject to arbitration.  (Doc. 10-2 at 51)  Nevertheless, Plaintiff argues the provisions related to claims subject to arbitration are substantively unconscionable.  (Doc. 14 at 12-15)  Plaintiff contends the arbitration agreement "is artfully drafted" to allow Halliburton "to seek an injunction from a court."  (*Id.* at 13)  In addition, Plaintiff contends the Program "specifically excludes representative actions brought under the PAGA, California Labor Code § 2698," though "[b]oth the California Supreme Court and the Ninth Circuit Court of Appeals have found a waiver of PAGA claims is contrary to public policy and unenforceable."  (*Id.* at 14, citing *Wulfe v. Valero Ref. Co. - Cal*. 2016

16

1    U.S. App. LEXIS 3781, at *3 (9th Cir. Mar. 1, 2016); *Iskanian v. CLS Transp. L.A., LLC*, 59 Cal 4th

2    348, 388-89 (2014)).

        *i.    Seeking injunctions*

4            Under the Program provisions, "[a]ny court with jurisdiction over the Parties may issue any

5    injunctive orders (including preliminary injunctions) if the necessary legal and equitable requirements

6    under applicable law are met pending the institution of proceedings…" (Doc. 10-2 at 70)  Although

7    Plaintiff argues this provision benefits only Halliburton, there is nothing that precludes the other party

8    —whether an prospective employee, current employee, or former employee—from seeking an

9    injunction against Halliburton.   Consequently, this provision is not substantively unconscionable.

10            *ii.    Representative and PAGA claims*

11           As Plaintiff notes, in *Wulfe* the Ninth Circuit indicated "pre-dispute agreements to waive the

12   right to bring a representative PAGA claim are unenforceable and that this rule is not preempted by the

13   FAA." *Id.*, 2016 U.S. App. LEXIS 3781 at *3 (citing *Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d

14   425 (9th Cir. 2015)).  However, Plaintiff does not seek to bring a representative action, and this

15   provision is not relevant to the matter before the Court.  Accordingly, the provision limiting parties

16   from bringing representative actions may be severed from the agreement. *See, e.g., Grabowski v. C.H.*

17   *Robinson Co.*, 817 F. Supp. 2d 1159 (S.D. Cal. 2011) (finding three substantively unconscionable

18   provisions could be severed from an arbitration agreement which was not "permeated by

19   unconscionability," thus rendering the agreement enforceable); *Stacy v. Brinker Rest. Corp.*, 2012 U.S.

20   Dist. LEXIS 150345, at * 31-32 (E.D. Cal. Oct. 18. 2012) (explaining the substantively unconscionable

21   provision could be severed because it was "collateral to the Agreement and does not permeate the

22   Agreement with unconscionability").

23            *iii.    Conclusion*

24           As noted above, the claims subject to arbitration include claims by employees *or* Halliburton.

25   Defendants have not excluded claims the companies may bring against employees from the arbitration

26   agreement.  The totality of the claims subject to arbitration does not appear unconscionable.  *See*

27   *Ferguson*, 298 F.3d at 784, n.6 (explaining substantive unconscionability may be demonstrated when

28   an employer seeks to enforce "what is essentially a unilateral arbitration agreement" because the

1   company excludes claims it may bring against the employee from the agreement). However, the Court

2   recommends the provision limiting representative claims be severed from the agreement.

3                    b.        *Filing fees and cost arrangement*

4              When arbitration is a condition of employment, an employer "cannot generally require the

5   employee to bear any *type* of expense that the employee would not be required to bear . . . in court."

6   *Armendariz*, 24 Cal. 4th at 110 (emphasis in original). A scheme that makes each party bear half the

7   costs of the arbitration "alone would render an arbitration agreement unenforceable." *Circuit City v.*

8   *Adams*, 279 F.3d 889, 894 (9th Cir. 2002). For example, the Ninth Circuit found a cost-splitting

9   provision substantively unconscionable when the agreement forced the plaintiffs to pay the filing fee

10  up to a maximum of $125.00 and share costs equally after the first day of arbitration. *Ferguson*, 298

11  F.3d at 781*; see also Ingle*, 328 F.3d at 1177-78 (finding a provision substantively unconscionable that

12  stated "each party shall pay one-half of the costs of arbitration following the issuance of the arbitration

13  award").

14             Halliburton's program requires an employee initiating the arbitration to pay a fee of $50.

15  (Doc. 10-2 at 71) Beyond this filing fee, "Employee/Applicant Parties shall not be responsible for

16  payment of fees and expenses of proceedings . . ." (*Id.*) The "Legal Consultation Plan" requires

17  Halliburton to pay up to $2,500 of the employee's legal fees." (*Id.* at 84) In addition, the arbitrator is

18  authorized to "allow a prevailing Employee or Applicant reasonable attorney's fees, expert witness'

19  fees, and other costs which may be allowable under the Federal Rules of Civil Procedure as part of the

20  award." (*Id.* at 57) Thus, the provisions governing the initiation fee and costs do not require

21  employees to incur any type of costs they would otherwise avoid in court, and the fee/cost

22  arrangement under the Plan is not substantively unconscionable.

23                    c.        *Statute of limitations*

24             When evaluating a statute of limitations set forth in arbitration agreement, "[t]he critical

25  question is whether 'the period fixed is so unreasonable so as to show imposition or undue advantage

26  in some way.'" *Jackson v. S.A.W. Entm't Ltd.*, 629 F. Supp. 2d 1018, 1028 (N.D. Cal. 2009) (quoting

27  *Moreno v. Sanchez*, 106 Cal. App. 4th 1415, 1430 (2003). Generally, provisions strictly requiring

28  employees to bring all claims within one year are unconscionable. *Adams*, 279 F.3d at 894-95.

Here, the rules provide an arbitration proceeding must be initiated "within one year after the event which gives rise to the Dispute or the time allowed by applicable law for the filing of a judicial complaint, whichever is longer." (Doc. 10-2 at 72) Accordingly, the arbitration agreement does not impose a shortened statute of limitations upon the parties, and there is no imposition or undue advantage. Consequently, the statute of limitations provision is not substantively unconscionable.

### d.    Remedies

Remedy provisions that "fail[] to provide for all the types of relief that would otherwise be available in court" by limiting an employee's total and punitive damages are substantively unconscionable. *Adams*, 279 F.3d at 895 (citing *Cole v. Burns Int'l Sec. Servs.,* 105 F.3d 1465, 1482 (9th Cir. 1997)). The Program "Plan and Rules" provide the arbitrator has "the authority to determine the applicable law and to order any and all relief, legal or equitable, including punitive damages, which a Party could obtain from a court of competent jurisdiction on the basis of the claims made in the proceedings." (Doc. 10-2 at 57) Therefore, the Program does not improperly limit available remedies, and the provision is not substantively unconscionable.

### e.    Venue

Plaintiff asserts the Program "does not provide for a venue in a set location," and as a result "there is nothing to prevent Halliburton from seeking to hold the arbitration hearing at a venue,  even one outside of California[,] that creates undue hardship for Mr. Harris." (Doc. 14 at 14) Accordingly, Plaintiff contends the lack of a venue provision renders the Program substantively unconscionable. (*Id.*, citing *Poublon v. C.H. Robinson Co*., 2015 U.S. Dist. LEXIS 6881 at *19 (C.D. Cal. January 12, 2015); *Pinedo v. Premium Tobacco Stores, Inc*., 85 Cal. App. 4th 774, 781 (2000)).

Significantly, however, the Program provides that "[t]he arbitrator shall set the date, time, and place of any proceeding" and "[t]he arbitrator may consider, short of imposing undue expense on the Company, *accommodation of the Employee or Applicant* in the selection of a proceeding location." (Doc. 10-2 at 63, emphasis added) Thus, as Defendants argue, this provision favors accommodation of the employee over the company. (Doc. 15 at 5)

Moreover, this provision may be distinguished from the cases cited by Plaintiff, which required the arbitrations to occur in locations that were *not* convenient to the plaintiffs, and did not allow for an

arbitrator to accommodate the plaintiff.   For example, in *Poublon*, the arbitration agreement indicated

the venue of any dispute would be Hennepin County, Minnesota, and "[u]nless the Parties otherwise

agree or the Arbitrator otherwise directs for good reason, any hearing shall be conducted and deemed

held in that county of venue, at a place convenient to the Parties as so designated by the Arbitrator."

*Id.*, 2015 U.S. Dist. LEXIS 6881 at *17.   The court explained:

> The California Supreme Court has explained that a forum selection clause requiring
> arbitration in a distant forum is unconscionable where it imposes significant hardships
> on the weaker party and has "no justification other than as a means of maximizing an
> advantage over the" weaker party." *Bolter v. Superior Court*, 87 Cal. App. 4th 900, 910,
> 104 Cal. Rptr. 2d 888 (2001).   Similarly, in *Nagrampa*, the Ninth Circuit found that a
> provision designating Boston as the arbitral forum was unconscionable under California
> law because it required arbitration "only a few miles from [the employer's]
> headquarters, but three thousand miles away from Nagrampa's home." [*Nagrampa v.
> Mailcoups, Inc.,* 469 F.3d 1257, 1289 (9th Cir. 2006)].   The court explained that where
> the forum selection clause was imposed by a stronger party and effectively precluded
> plaintiff from pursuing her claims because of the prohibitive costs of distant litigation,
> the clause was unenforceable.   *Id.* at 1289-90; *see also Acosta v. Fair Isaac Corp.*, 669
> F. Supp. 2d 716, 722 (N.D. Tex. 2009) (finding a forum selection clause unconscionable
> under California law where it required arbitration in California of an agreement entered
> into in Texas); *cf. Pinedo v. Premium Tobacco Stores, Inc.*, 85 Cal. App. 4th 774, 781,
> 102 Cal. Rptr. 2d 435 (2000) (finding as a factor weighing in favor of unconscionability
> a provision requiring a Los Angeles plaintiff to arbitrate in Oakland).

*Id.*, 2015 U.S. Dist. LEXIS 6881 at *17.   Thus, courts have consistently determined clauses setting the

venue in a location inconvenient to an employee are substantively unconscionable.   However, here,

there is no specific venue and arbitrators are instructed to consider a location that accommodates the

employees or applicants who have a dispute with Halliburton.   (*See* Doc. 10-2 at 63)   Accordingly, the

provision regarding the venue is not substantively unconscionable.

> ### f.   *Award of attorney fees and costs*

Plaintiff asserts Halliburton's arbitration program "allows for the Arbitrator to provide an

award of attorney fees to the successful party even if such fees would normally not be available in a

court of law (e.g. for an action under the FEHA or a wage recovery action under the California Labor

Code.)"   (Doc. 14 at 14-15)   Plaintiff contends "[t]his provision is substantively unconscionable as

well."   (*Id.*, citing e.g., *Trivedi v. Curexo Technology Corp.*, 189 Cal. App. 4th 387, 393 (2010)).   In

addition, Plaintiff asserts the Program is "substantively unconscionable because Paragraph 8.D allows

for an award of costs under the Federal Rules of Civil Procedure to a prevailing defendant."   (*Id.* at 15)

Notably, despite Plaintiff's contentions, Paragraph 8.D provides that the arbitrator "may allow

1   *a prevailing Employee or Applicant* reasonable attorney's fees, expert witness' fees, and other costs

2   which may be allowable under the Federal Rules of Civil Procedure as part of the award."  (Doc. 10-2

3   at 57, emphasis added)  Thus, the provision does not allow for an award of fees or costs to Halliburton,

4   and the provision governing awards of attorney fees and costs is not substantively unconscionable.

5                    g.       *Unilateral amendment and termination*

6          When provisions of an arbitration agreement permit an employer to unilaterally amend or

7   terminate the agreement, even with written notice to employees, the provision is substantively

8   unconscionable.  *See, e.g., Ingle*, 328 F.3d at 1179; *Ramirez-Baker v. Beazer Homes, Inc.*, 636 F. Supp.

9   2d 1008, 1021-22 (E.D. Cal. 2008).  The Ninth Circuit explained a provision granting an employer

10   unilateral power to amend or terminate an arbitration agreement, even with written notice to employees,

11   proscribes an employee's ability negotiate and "embeds its adhesiveness."  *Ingle*, 328 F.3d at 1179.

12          Here, the "Plan and Rules" provide amendment or termination of the Program may occur "at

13   any time by giving at least 30 days' notice to current Employees."  (Doc. 10-2 at 56)  No amendments

14   would apply to a dispute "which arises prior to the effective date of the amendment."  (*Id.*) Therefore,

15   Halliburton's ability to avoid pending claims by amendment is limited.  Nevertheless, Halliburton

16   maintains the right to amend or terminate the Program, and "the arbitration agreement affords no such

17   power to employees."  *See Ingle*, 328 F.3d at 1179.  Consequently, the provision is substantively

18   unconscionable.

19                    h.       *Agreement as a whole*

20          California law provides: "If the court as a matter of law finds the contract or any clause of the

21   contract to have been unconscionable at the time it was made the court may refuse to enforce the

22   contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may

23   so limit the application of any unconscionable clause as to avoid any unconscionable result."  Cal. Civ.

24   Code § 1670.5(a).  Refusing to enforce an arbitration agreement is appropriate "only when an

25   agreement is permeated by unconscionability."  *Armendariz*, 24 Cal.4th 83 at 122 (internal quotation

26   marks omitted).  Courts often look to whether the offending provisions "indicate a systematic effort to

27   impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum

28   that works to the employer's advantage."  *Id.* at 124; *see also Ferguson*, 298 F.3d at 787-88.  For

example, the Ninth Circuit found an arbitration agreement was "permeated by unconscionable clauses" where there was a "lack of mutuality regarding the type of claims that must be arbitrated, the fee provision, and the discovery provision." *Ferguson*, 298 F.3d at 788.

In this agreement, the only provisions of the Program appearing substantively unconscionable are those granting unilateral amendment and termination of the dispute resolution program.  However, the "Plan and Rules" provisions regarding fees and costs and the statute of limitations, are not permeated by unconscionability and do not establish an inferior forum that works to Defendants' advantage.  *See Armendariz*, 24 Cal. 4th 83 at 122.  Significantly, it does not appear the provisions regarding amendment and termination are relevant to Plaintiff's claims, and may be severed from the agreement.  *See, e.g., Grabowski*, 817 F. Supp. 2d 1159; *Stacy*, 2012 U.S. Dist. LEXIS 150345, at * 31-32.  Accordingly, the provisions governing amendment and termination may be severed, and the arbitration agreement enforced because the terms, taken as a whole, do not appear substantively unconscionable.

### C.    The arbitration agreement encompasses the disputes at issue.

To determine whether an arbitration agreement encompasses particular claims, the Court looks to the plain language of the agreement, and "[i]n the absence of any express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."  *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584-86 (1960).

Significantly, the Supreme Court explained, "Parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.  *Rent-A-Center, W., Inc. v. Jackson*, 130 S. Ct. 2772, 2779-80 (2010).  Here, under the terms of the Program, the parties agreed to arbitrate any dispute related to the Plan, which includes disputes relating to the enforcement or interpretation of its provisions, and "allegations of discrimination based on race, sex, religion, national origin, age, veteran status or disability; sexual or other kinds of harassment; wrongful discharge; worker's compensation retaliation; defamation; infliction of emotional distress; failure to pay wages." (Doc. 10-2 at 52).  Further, the Plan provides that its provisions "shall be applicable to all Disputes between Employees and the Company's clients,

22

customers, contractors, and vendors," which may encompass the "Doe" defendants.  (*Id.* at 19)  Based upon these broad specifications, it is clear that the disputed issues are encompassed within the arbitration agreement.

## V.      Findings and Recommendations

Plaintiff and Defendants entered into a valid arbitration agreement, which encompasses the issues in dispute.  As a result, "there is a presumption of arbitrability" and Halliburton's motion to compel arbitration should not be denied.  *See AT&T Tech., Inc.*, 475 U.S. at 650.  Accordingly, the Court **RECOMMENDS**:

1.      The clauses governing representative actions, amendment, and termination be severed from the Program plan;

2.      Defendants' motion to compel arbitration be **GRANTED**;

3.      The matter be **STAYED** to allow the completion of the arbitration;

4.      That within 120 days and every 120 days thereafter, counsel **SHALL** file a joint status report.  In addition, within 10 days of the determination by the arbitrator, counsel **SHALL** file a joint status report;

5.      The Court retain jurisdiction to confirm the arbitration award and enter judgment for the purpose of enforcement.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within 14 days after being served with these Findings and Recommendations, any party may file written objections with the Court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

///

///

///

///

///

1
2
3

The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991); *Wilkerson v. Wheeler*, 772 F.3d 834, 834 (9th Cir. 2014).

4
5

IT IS SO ORDERED.

6

Dated:   **June 13, 2016**                    **/s/ Jennifer L. Thurston**

7
                                                     UNITED STATES MAGISTRATE JUDGE

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28